## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| ALDO PEREZ, | ) | |
| | ) | |
| Plaintiff, | ) | No. 19 C 4135 |
| | ) | |
| v. | ) | Judge John J. Tharp, Jr. |
| | ) | |
| UNION PACIFIC RAILROAD | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION AND ORDER

The plaintiff, Aldo Perez, has sued his former employer, Union Pacific Railroad Company ("UP"), after falling and injuring his knee while working at one of UP's rail yards. He claims UP negligently caused his injury in violation of the Federal Employer's Liability Act, 45 U.S.C. § 51, and then fired him for reporting those injuries in violation of the whistleblower provision of the Federal Rail Safety Act, 49 U.S.C. § 20109(a)(4). UP has moved for summary judgment on both claims. Because Perez has not adduced sufficient evidence to support a jury verdict on either claim, UP's motion for summary judgment is granted.

### FACTUAL BACKGROUND[1]

*Perez's Injury*

Perez was an employee with UP for about ten years. On a snowy day in April 2018, he was working as part of a switching crew at UP's Global One Yard in Chicago, which he testified was in "horrible condition" and "a horrible mess." Due to the accumulation of snow on the ground that day, UP required Perez to wear certain spikes on his boots to reduce the risk of slipping on the

---

[1] Unless otherwise noted, the following facts are undisputed.

snow and ice. He testified that he inspected his spikes before wearing them that day and did not

see anything wrong. Nevertheless, after starting work that morning, Perez lost his footing while

walking across the tracks, fell, and injured his knee. No one witnessed the fall. Perez testified that

he did not know what caused him to fall: "I know I slipped. You know, did I slip on a hose? I don't

know. Did I fall in a hole? Did I lose my footing? Snagged? I couldn't tell you." PRDSF ¶ 16.[2]

Perez acknowledged that the ground was covered in snow, but he believed that his spikes must

have snagged onto "something." He also testified that he did not know whether he tripped on the

rail. He did not inspect his spikes for defects after falling to see if they may have been the cause.

Perez remained on the ground in extreme pain and needed assistance. After regaining his

composure, he radioed his coworkers to get help. He testified that it took five-to-ten minutes for

someone to respond. Eventually, some other employees, including Brian Hill, Perez's manager,

arrived and transported Perez back to the yard office. Perez testified that when he arrived at the

yard office, he requested a doctor, but Hill told him wait in the vehicle while Hill went into the

office for about fifteen minutes. When Hill returned to the vehicle, Perez repeated his request, and

Hill again told him to hold on and went inside again for another fifteen minutes. After these two

fifteen-minute intervals passed without anyone calling for a doctor or an ambulance, a coworker

called 911 from his cell phone and Perez explained the situation to the operator and requested an

ambulance himself.

Kevin Amos, Senior Manager of Operating Practices, received a call around 12:25 p.m.

from Brian Hill informing him that Plaintiff had tripped over the rail in the extension yard. While

the ambulance was en route, Amos arrived at the yard office and asked Perez whether his injury

---

[2] In response to the question whether there was "anything about the yard that caused you
to fall," Perez also testified "I can't really answer that question because it—as I said, I can't—I
don't understand how it happened." Perez Dep. 40:10-21.

had anything to do with a hearing Perez was facing on a critical rule violation that had occurred a couple of days earlier. Perez testified that he said no, it was an irrelevant question (the violation in question had apparently been resolved), and he was done talking to Amos. Amos then went to inspect the yard but testified he did not see anything amiss or any snow on the ground where he guessed Perez had fallen. (Amos did not know the precise location where Perez fell.)

*Hospital and Drug Testing*

An ambulance arrived and took Perez to Mt. Sinai Hospital, which was only a five-minute drive from the yard. Once in the waiting area, he called his girlfriend to tell her what had happened. He also tried to call his union, but no one answered. Later, Justin Anderson, UP's director of train operations, arrived at the hospital, followed by Amos shortly thereafter. All three were in the waiting room where Perez, in a wheelchair, was waiting for x-rays after being given some pain medication. Anderson asked Perez what happened. Perez said he tripped over a rail and hurt his knee.

Anderson decided that Perez should take a drug test based on his potential violation of UP safety rules concerning the avoidance of slips, trips, and falls. While Perez was still in triage, Anderson instructed Amos to call Midlands Testing to schedule a drug and alcohol test. When Perez came out of triage, Anderson asked him whether he was going to come back to the yard or if his girlfriend was going to give him a ride. Perez answered that he planned to go home from the hospital after finishing his treatment. At that point, Anderson informed Perez that a drug and alcohol test would have to be administered. In response, Perez asked if they could conduct the test at the hospital instead of the yard. Anderson then contacted former UP drug & alcohol manager, Penny Lyons, to see whether the drug test could be performed at the hospital. She confirmed that

it could. Anderson then instructed Amos to contact their testing vendor to inform them of the new location.

After speaking with Lyons and Amos, Anderson came back and told Perez that the test would be performed at the hospital. In response, Perez said that he was done cooperating with and speaking to Anderson, stating, "I'm refusing to cooperate with you," and, "I want you to leave." Dep Tr. 18:22-119:2; 119:12-16. They could, according to Perez, have a more productive conversation at a later time. In response to Anderson, who repeatedly emphasized the consequences of noncompliance, Perez continued to say that he was done cooperating. Anderson went outside, spoke again to Lyons, and then came back into the hospital and asked Perez the following three questions: (1) Do you understand that I have directed you to take a drug and alcohol test?; (2) Do you understand if I leave here it is going to be a refusal?; and (3) Do you understand that I am giving you the opportunity right now to take this drug and alcohol test? Perez answered all of Anderson's questions with, "I don't understand." Anderson deemed this as a refusal, informed Perez that he understood Perez to be refusing the drug test, and left the hospital. Perez tried calling Anderson shortly thereafter to say he would come to the yard and take the test, but Anderson concluded that "the opportunity to take the test had gone by." Ex. D at 36:3-15. UP ultimately charged Perez with failing to comply with a reasonable-cause drug test and terminated his employment.

*UP's Drug and Alcohol Testing Regime*

UP has the authority to test its employees for drugs and alcohol in a limited number of situations, one of which is when a manager has a good faith belief that an employee may have violated a rule that has a direct impact on safety. In this case, the potential rule violations triggering the reasonable cause test were two rules mandating employees to observe safety practices by taking

4

certain precautions and remaining alert in order to avoid slips, trips, and falls. Anderson testified that tripping over a rail would be a possible violation of one or both of these rules. The UP's rules also state, however, that the occurrence of a personal injury alone does not constitute sufficient cause to trigger a drug and alcohol test. It is not unusual to ask an employee to take a reasonable cause test at a medical facility or after that employee has already been administered medication (a positive result based on the presence of that medication in the sample would be disregarded). Under UP's policies, a refusal to take a drug test is automatic grounds for termination. Even if a drug test is demanded in error, the employee is not permitted to refuse the test and, if he does, is still subject to termination. Perez is unaware of anyone who has refused a drug test and not been terminated as a result. Finally, Perez has submitted evidence that he had taken, and passed, numerous drug and alcohol tests during his employment with UP.

## ANALYSIS

Summary judgment is appropriate only when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In deciding a motion for summary judgment, the Court must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Love v. JP Cullen & Sons, Inc.*, 779 F.3d 697, 701 (7th Cir. 2015). If the moving party has demonstrated the absence of a disputed material fact, then the burden shifts to the nonmoving party to "provide evidence of specific facts creating a genuine dispute." *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012).

**I. Negligence**

Perez claims that UP's negligence caused his injuries. He seeks to hold the company liable under the Federal Employer Liability Act, which provides:

> Every common carrier by railroad . . . shall be liable in damages to
> any person suffering injury while he is employed by such
> carrier . . . for such injury or death resulting in whole or in part from
> the negligence of any of the officers, agents, or employees of such
> carrier, or by reason of any defect or insufficiency, due to its
> negligence, in its cars, engines, appliances, machinery, track,
> roadbed, works, boats, wharves, or other equipment.

45 U.S. Code § 51. The FELA affords railroad workers with relatively broad latitude in prosecuting

personal injury cases against their employers. Courts have characterized it as a "a broad remedial

statute to be construed liberally in order to effectuate its purpose" of "provid[ing] an injured worker

with an expeditious recovery and also giv[ing] a railroad the incentive to maintain vigilance over

the safety of its workers and, concomitantly, the conditions in which they must work." *Kulavic v.

Chicago & Illinois Midland Ry. Co.*, 1 F.3d 507 (7th Cir. 1993). Under the FELA, an employee is

entitled to proceed before the jury if he has adduced any evidence sufficient to "justify with reason

the conclusion that employer negligence played any part, even the slightest, in producing the injury

or death for which damages are sought." *Rogers v. Missouri Pac. R. Co.*, 352 U.S. 500, 506 (1957);

*see also Harbin v. Burlington N. R. Co.*, 921 F.2d 129, 131 (7th Cir. 1990) ("It follows that a trial

judge must submit an FELA case to the jury when there is even slight evidence of negligence.");

*Wilson v. Chicago, Milw., St. P., & Pac. R.R. Co.*, 841 F.2d 1347, 1353 (7th Cir. 1988) ("The

evidence required for a finding of negligence [under the FELA] dictates a corresponding 'slightest'

hurdle for avoiding" summary judgment. . . . The right to a jury determination is part and parcel

of the liberal remedy afforded the working person under the FELA.") *cert. dismissed*, 487 U.S.

1244 (1988).

But, "[a]s light as this burden is, the plaintiff must still present some evidence of

negligence . . . specifically, the plaintiff must offer evidence creating a genuine issue of fact on the

common law elements of negligence, including duty, breach, foreseeability, and causation." *Ruark

v. Union Pac. R.R. Co.*, 916 F.3d 619, 625-26 (7th Cir. 2019). Thus, to survive summary judgment

on his claim, Perez must have adduced evidence that (1) a harmful circumstance existed; (2) that harmful circumstance can be reasonably inferred, even based on minimal circumstantial evidence, to have played a part in his injury; (3) a reasonable person would foresee that circumstance as creating a potential for harm; and (4) the employer had actual or constructive notice of that circumstance. *See Holbrook v. Norfolk S. Ry. Co.*, 414 F.3d 739 (7th Cir. 2005). UP is correct that Perez has not adduced sufficient evidence to create a material dispute as to the existence of any harmful circumstance, that UP was negligent with respect to that circumstance, or that the circumstance played a part in his injury.

Perez claims that UP failed to exercise ordinary care in furnishing him with a reasonably safe place to work. Specifically, he contends that UP failed to inspect the yard and make reasonable efforts to maintain it as a safe environment. According to Perez, UP knew or should have known that the poor condition of the yard, especially when covered with snow, posed an unreasonably high risk of injury to employees, and this risk materialized when Perez's boot snagged on something underneath the snow, leading to his injury.[3] Perez has not staked out what that "something" was, however; he has admitted under oath that he does not know what caused him to fall. UP has moved for summary judgment on this claim, arguing that without any non-speculative

---

[3] Perez's complaint is rife with allegations that the boot spikes UP assigned to him as PPE were in some way defective, *see, e.g.*, Compl. (ECF No. 1) ¶¶ 12, 39, 54, but he appears to abandon this theory in his response to UP's motion for summary judgment. Instead, he argues that his boot spike "snagged on something he could not see due to the ice and snow," and that UP should have inspected and cleared the area to prevent that "something" from being there, rather than that the spike was faulty because it should not have snagged on anything in the first place. Pl.'s Resp. (ECF 52) at 6. Accordingly, and in light of the lack of any evidence in the record that the spike was possibly defective, the Court, in consonance with the parties' briefs on summary judgment, focuses solely on the issue of whether UP negligently failed to furnish Perez with a reasonably safe place to work.

evidence of what caused his fall, Perez cannot prove that UP breached any duty to him or that his incident was reasonably foreseeable by UP.

The record is devoid of any indication of what caused Perez's fall. He testified that his spikes ***may*** have "snagged on something" under the snow where he stepped because the working area was horribly maintained and messy and that the accumulation of snow concealed this condition, but this is speculation. Mr. Perez acknowledged repeatedly during his deposition that he did not know what caused him to fall. He testified that he slipped, but as to what caused him to slip, he did not know: "I couldn't tell you." PRDSF ¶ 16. In response to the question whether there was "anything about the yard that caused you to fall," Perez also testified "I can't really answer that question because it—as I said, I can't—I don't understand how it happened." Perez Dep. 40:10-21. Mr. Perez's candor on this point is admirable, but it does not obviate his obligation to provide evidence as to what caused his fall rather than guesswork. "I don't know" is not an answer sufficient to create a material issue of fact as to what caused Mr. Perez's fall.

"A FELA plaintiff 'is not impervious to summary judgment. If the plaintiff presents no evidence whatsoever to support the inference of negligence, the railroad's summary judgment motion is properly granted.'" *Ruark*, 916 F.3d at 626 (quoting *Lisek v. Norfolk & W. Ry. Co.*, 30 F.3d 823, 832 (7th Cir. 1994). A jury in this case could not possibly identify a negligent condition that caused (in whole or part) Perez to fall; Perez himself could not do so. This case therefore falls short of the standard set by courts when they have upheld jury verdicts where probative evidence of some dangerous condition causing an injury was entirely circumstantial and relatively minimal in comparison to traditional common-law negligence cases. Those cases involved plaintiffs who were able to proffer specific dangerous conditions in their workplaces, evidence that their employers were responsible for those the existence of those conditions, and that their employers

had notice of them. In *Gallick v. Baltimore & Ohio R.R. Co.*, 372 U.S. 108 (1963), for instance, "the Supreme Court upheld a jury verdict for a plaintiff who lost both his legs as a result of an infected insect bite based upon a rather remote connection between the injury and the employer's negligence in maintaining a stagnant pool of water attractive to vermin and insects." *Harbin*, 921 F.2d at 132 (discussing *Gallick*). The Seventh Circuit provided a helpful summary of the evidence in *Gallick* while comparing it to the evidence before it in *Harbin*:

> Gallick's evidence could place the agent that caused his injury within the temporal and physical vicinity of the dangerous condition of which his employer knew, Holbrook's evidence cannot. In Gallick, no one disputed the very presence of the fetid pool, or the plaintiff's proximity to it at the time he was bitten by the insect. Gallick had been bitten by the insect within two seconds after walking away from the stagnant pool. Such temporal and physical proximity to the known hazard rendered reasonable the inference that the condition played a part in Gallick's injury. Surely, if Gallick had not been able to establish the existence of a cesspool on his employer's premises or his presence near it at the time he was bitten by the insect, no reasonable inference could be drawn that that cesspool might have played a part in his injury.

*Id.* at 744. As can be readily observed, the evidence in *Gallick* was capable of supporting a reasonable inference of causation and foreseeability. Based on the record in this case, however, it would be unreasonable for a factfinder to attribute—even just in part—Perez's injury to his boot snagging on "some" unidentified condition that UP had notice of and was responsible for abating, without any evidence as to what that condition may have been. Otherwise, any rail worker who slips and falls in the snow, for any reason, would be able to reach a jury by making similarly vague and speculative assertions. The contours of the doctrine of *res ipsa loquitur*, though Perez did not invoke it here, are instructive. Plaintiffs invoking that doctrine are unable to proceed under that theory of negligence when they lack evidence that they were injured "in circumstances that ordinarily would not occur absent negligence," *Smith v. U.S.*, 860 F.3d 995, 998 (7th Cir. 2017), *i.e.*, those situations where the injury "can be as readily attributed to pure accident as to

negligence." *Nickel v. Hollywood Casino-Aurora, Inc.*, 730 N.E.2d 1212, 1215 (Ill. App. 2d Dist. 2000). Here, Perez's injury can be more readily attributed to pure accident than anything else, much less some unidentified dangerous condition that UP had notice of and should have abated.

A final point: Perez does not argue that UP's unexplained delay in providing him with medical attention or facilitating his transportation to the hospital when he arrived at the yard office exacerbated any of his injuries. There are no facts in this record upon which that inference can be made. Viewing the facts in the light most favorable to Perez, as the Court must, this delay demonstrated callousness toward Perez's wellbeing, but without any facts to support the inference that the delay in treatment contributed to any additional injury beyond that which Perez suffered during the initial fall, or any argument to that effect by Perez, the Court cannot unilaterally refashion Perez's negligence claim to allow him to proceed on that basis.

## II.    Retaliation

Perez also seeks to hold UP liable for unlawfully retaliating against him for reporting his personal injury in violation of the Federal Railway Safety Act. Section 20109(a)(4) of the FRSA prohibits railroads from discharging, or otherwise discriminating against an employee, "if such discrimination is due, in whole or in part, to the employee's lawful, good faith act done . . . to notify, or attempt to notify, the railroad carrier . . . of a work-related personal injury." 49 U.S.C. § 20109(a)(4). "To make a prima facie showing of unlawful retaliation in this specific context, an employee must show that: (1) he made an injury complaint in good faith (i.e., engaged in a protected activity); (2) the rail carrier knew of the complaint; (3) he suffered an adverse employment action; and (4) the complaint was a contributing factor in the adverse action. Once that showing is made, the rail carrier can still escape liability if it can show, by clear and convincing evidence, that it would have taken the same action absent the protected activity." *Armstrong v. BNSF Ry. Co.*, 880 F.3d 377, 381 (7th Cir. 2018) (citations omitted).

There is no dispute as to the first three elements of Perez's prima facie case. Perez reported his injury to UP, UP (meaning those responsible for the relevant adverse employment decision) became aware of that reporting, and UP ultimately terminated his employment.[4] UP does contend, however, that it fired Perez for refusing to take a drug test when he was at the hospital, and Perez therefore cannot demonstrate that his reporting of the injury was a contributing factor in his termination, that UP made its decision with any discriminatory animus, and that UP would have fired Perez regardless of whether he engaged in protected activity due to that refusal.

The Seventh Circuit has "acknowledged that a 'contributing factor' is something less than a substantial or motivating one." *Addis v. Dept. of Lab.*, 575 F.3d 688, 691 (7th Cir. 2009). It is "any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision." 29 C.F.R. part 1982 (2010).

Here, UP argues that it fired Perez for refusing to take a drug test, not for reporting his injury. Therefore, according to UP, Perez cannot satisfy the contributing factor element of his claim. Of course, Perez's injury and subsequent report of his injury to UP was the event that set off the chain of events culminating in UP's decision to terminate him. If Perez had not apprised UP of his injury, UP would not have sought to drug test him, he would not have refused the test (or, possibly, Anderson would not have understood Perez to be refusing the test), and UP would

---

[4] UP also contends that its demands that Perez take the drug test did not amount to an actionable adverse employment action. *See Stockett v. Muncie Indiana Transit System*, 221 F.3d 997, 1001-02 (7th Cir. 2000) (outlining the circumstances in which requiring a plaintiff to submit to a drug test can amount to an actionable adverse employment action under Title VII). It may well be that those demands did not amount to an actionable retaliatory act in this case. But Perez is proceeding on the theory that UP used his supposed refusal to take the drug test as a pretext for firing him. That is, his retaliation claim is based on his termination—not the drug test request—as the adverse employment action. Therefore, the parties' arguments with regard to the facts surrounding the demands for and refusal of the drug test are more appropriately analyzed under the remaining element of his prima facie case (contributing factor) and whether UP would have terminated Perez absent the protected activity.

not have charged him with refusing a drug test, which is a fireable offense. But the Seventh Circuit's "caselaw is clear that a plaintiff alleging retaliation in violation of § 20109(a)(4) cannot point only to the sequence of events—an injury report followed by a later dismissal—to show that the complaint was a contributing factor in the adverse employment action." *Holloway v. Soo Line R.R. Co.*, 916 F.3d 641, 644 (7th Cir. 2019).

"Something more than the mere sequence of events is required, and [the plaintiff] has failed to provide that something more." *Id*. at 644. "Evidence which may indicate a link between the protected activity and the allegedly adverse actions include: temporal proximity, indications of pretext, inconsistent application of an employer's policies, an employer's shifting explanations for its actions, antagonism or hostility toward a complainant's protected activity, the falsity of an employer's explanation for the adverse action taken, and a change in the employer's attitude toward the complainant after he or she engages in protected activity." *Cyrus v. Union P. R.R. Co.*, 12 C 10248, 2015 WL 5675073 (N.D. Ill. Sept. 24, 2015) (internal quotation marks omitted). And a demonstration of causation based on the contributing factor element is not enough for a viable retaliation claim; "a plaintiff is . . . required to show that retaliation played at least some role in the decision." *Armstrong*, 880 F.3d at 382. Perez must be able to show that UP's decision to fire him was, "at some level, motivated by discriminatory animus," and such a showing "necessarily includes some proof of retaliatory motive." *Id*.

In its motion for summary judgment, UP argues that it cannot be liable if its decisions to drug test Perez, and then fire him for refusing to take the test, were based on the honest beliefs that he may have violated the safety rule, and that he actually refused to take the test, respectively. To counter, Perez must offer evidence capable of proving that Anderson sought to use the demand for a drug test and subsequent termination to retaliate against him for reporting his injury, and that he

12

actually possessed that motive. In sum, the record must be able to support a reasonable conclusion that the "employer possessed an improper (i.e., retaliatory) motive," and that "that motive influenced the employer's actions." *Id*.

In his response to UP's motion for summary judgment, Perez points to only a few facts to help his case. First, he argues, UP's demand that Perez take a drug test was not warranted. Perez contends that Anderson testified he was unaware of any employees who slipped, tripped, and fell ***and were not injured*** who were required to submit to a drug test. The relevant question here, however, would be whether there were employees who slipped, tripped, and fell ***and were injured*** who were not required to take a drug test; Perez has adduced no such evidence and in any event the evidence he cites indicates only that the manager was not aware of any such instances because they were not reported to him. *See* Anderson Dep. Tr., Ex. D to DSMF (ECF No. 47-4), at 28:19-30:10. Next, Perez argues that Anderson's demands that he take a drug test at the hospital were unreasonable, and it was also unreasonable for Anderson to fire him for refusing because Perez ultimately changed his mind and decided to take the test shortly thereafter. He has not offered any evidence, however, to support an inference that Anderson's decision to drug test him or fire him based off his refusal was pretextual.

To summarize the relevant undisputed facts surrounding the decision to ask him to test: Anderson based his decision to demand a drug test on his belief that Perez violated a safety rule when he fell. A UP manager's good-faith belief that an employee may have violated a rule directly impacting safety constitutes reasonable cause to conduct a drug test under UP's rules. Indeed, Lyons, the former UP drug & alcohol manager, testified that she had seen reasonable cause drug testing conducted for potential violations of the two rules UP based its decision on numerous times. And refusal to take a drug test is grounds for termination (even if the employee changes his mind

and agrees to take the test after initially refusing); Perez is unaware of any instances where an employee refused a drug test and got to keep their job. Finally, Lyons testified that it is not uncommon for UP to ask an employee to undergo a reasonable cause test while at a medical facility, and it is permissible to ask the employee to take the test before receiving care as long as the test does not interfere with the care. It was, moreover, at Perez's request that the test was going to be performed at the hospital. Accordingly, there does not appear to be any evidence of malintent when it comes to the decision to ask Perez to take the drug test. Perez has offered no evidence suggesting that a drug test would have interfered with his medical care, or that Anderson made the request knowing (or hoping) that Perez would be too incapacitated, or otherwise decline, to take it.

Finally, Perez contends that he did not actually refuse the drug test. His deposition testimony belies this argument. First, he admits that he initially refused to go back to the rail yard for a drug test and told Anderson to arrange for the drug testers to come to the hospital. Perez Dep. Tr., Ex. C to DSMF (ECF No. 47-3), at 117:7-17. Anderson then came back to tell Perez he had made such arrangements, and Perez then told Anderson to leave him alone because Perez was not willing to cooperate. *Id*. at 117:18-119:16 ("I told him I am refusing to cooperate, and I want you to leave."). He did testify that he refused because he was "in a lot of pain. [He] was stressed out." *Id*. at 120:10-16. But there is no evidence suggesting that he was in pain or under the influence of pain medication to the point of being ***unable*** to understand or cooperate with Anderson's drug testing request, or that taking a drug test would interfere with his care. He just didn't understand why it had to be done at that time, as opposed to after his treatment was complete. *Id.* at 116:16-20. Ultimately, Perez's testimony indicates that he knowingly refused to take the test, and his refusal was based on his belief that it was not the appropriate time for a drug test and his annoyance

14

with how UP was addressing an injured employee who was otherwise in good standing. *Id*. 126:19-127:8.[5] Accordingly, Perez has not offered sufficient evidence to support an inference that Anderson (a) demanded Perez take a drug test based on Perez's report of the injury, as opposed to Anderson's own good-faith belief that Perez's injury may resulted from him failing to follow safety rules, or (b) terminated him based on his report of the injury, as opposed to his refusal to take the drug test at the hospital.

*     *     *

For the foregoing reasons, UP's motion for summary judgment is granted. Judgment will be entered in favor of UP on both counts.

Dated: January 24, 2023

John J. Tharp, Jr.
United States District Judge

---

[5] Q: "Then why didn't you comply at the hospital?" A: "Because I was being treated. They had my best interests in their mind at that time. Union Pacific had shown me a different part. And in my opinion, they were not there for my best interests. They didn't want to call me in the hospital. As I said to Mr. Anderson, with all due respect, sir, we can have this productive conversation. Now is not the time. Now is just not the time. And he just kept hammering and hammering about this, oh, we got to take you back to the yard office; we got to take you back to the yard office. Now is not the time."